**Louis APOSTOLOU, et al., Adversary–Defendants/Appellants,**

v.

**Lawrence FISHER, as Trustee of the Estates of Lake States Commodities, Inc., and Thomas W. Collins, Adversary–Plaintiff/Appellee.**

**No. 94 C 7244.**

United States District Court,
N.D. Illinois,
Eastern Division.

Sept. 15, 1995.

Opinion on Denial of Rehearing
Oct. 19, 1995.

Louis W. Levit, Ross & Hardies, P.C., Chicago, IL, for plaintiff William A. Brandt, Jr., as Trustee of the Estates of Lake States Commodities, Inc. and Thomas W. Collins.

Lawrence Wiley Schad, Beeler, Schad & Diamond, P.C., Chicago, IL, for defendant Louis Apostolou.

Lawrence Wiley Schad, Steven J. Tomiello, Beeler, Schad & Diamond, P.C., Chicago, IL, Edward T. Joyce, Arthur W. Aufmann, Rowena T. Paras, Edward T. Joyce & Associates P.C., Chicago, IL, for defendants Peter Bizios, Gus Cappas, Spiros Chionis, Louis Dimas, Peter Dravilas, Ted Garbis, Irene Garbis, Vasilios Georgopoulos, Dean Glinos, James Glinos, Peter Glinos, Michael Gountanis, Steve Homatas, George Karabelas, Peter Klaritis, Julie Klaritis, Bill Kyriakopoulos, Joseph Lipira, Sandra Lipira, Ted Lykouretzos, Pat Lykouretzos, Gus Manaves, Spiros Mataragas, James Papadakis, Nick Pitsilos, Nick Revelis, Peter Sarantis, Bill Sizopoulos, Pete Spilios, Dorothea Touris, Mimi Tsoutsias, Nicholas Vangel, Paul Velliotis, Gust Vitogiannis, Steve Vitogiannis, Edward T. Joyce, Arthur W. Aufmann, Rowena T. Paras, Stephen B. Diamond.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

This bankruptcy appeal[1] presents a difficult question, namely, whether individual investors defrauded in a Ponzi scheme[2] can maintain a separate cause of action against non-debtor co-conspirators of the now bankrupt estates of Thomas Collins ("Collins") and his fictitious corporation, Lake States Commodities, Inc. ("Lake States")—the debtors. In this appeal, the appellants, defrauded investors known as the "Apostolou Plaintiffs,"[3] seek reversal of the bankruptcy court's ruling[4] that the federal claims they filed in the district court[5] against certain non-debtor co-conspirators of the debtors violate the automatic stay provision of the Bankruptcy Code, 11 U.S.C. § 362. Appellants also seek dissolution of the injunction

1. This is an appeal from the United States Bankruptcy Court, for the Northern District of Illinois, Eastern Division, Case Nos. 94 B 12123 and 94 B 12125, jointly administered by the trustee, and No 94 A 1339, Judge Susan Pierson Sonderby presiding.

2. The "Ponzi" scheme derives its name from the machinations of Charles Ponzi described in *Cunningham v. Brown*, 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924). In an elaborate scheme to defraud investors using a fictitious international postal coupon trade, Ponzi borrowed money from investors on credit and claimed he was buying and selling the international postal coupons at 100% profit. Ponzi promised to pay the investors one and a half times their initial investment within 90 days. By paying initial investors within 45 days Ponzi induced many more to invest. He made no investments of any kind and paid investors with money new investors contributed.

3. The Apostolou Complaint in the Geldermann lawsuit is brought by 107 individuals seeking separate and personal recovery on their own behalf and not on behalf of the entire class of similarly situated creditors numbering approximately 450.

4. On October 12, 1994, the bankruptcy court issued an oral ruling on the Adversary Complaint, filed by the interim trustee on July 28, 1994, denying the Apostolou Plaintiff's Motion to Dismiss and granting the relief sought in the Adversary Complaint, i.e., a declaratory judgment that the district court cases violated the automatic stay provisions of § 362 and the entry of an order restraining and enjoining any further

prosecution of the district court cases pursuant to § 105. An additional TRO motion was filed by the trustee concurrently with the filing of the Adversary Complaint, but was apparently mooted by the bankruptcy court's ruling on that Complaint. The bankruptcy court's oral ruling was memorialized in a judgment order entered on October 21, 1994, to which a transcript of the oral ruling was appended. Prior to the entry of judgment, the complaint filed in district court by the Apostolou Plaintiffs was amended to add 70 more plaintiffs. Because the Judgment Order was predicated on the original complaint, the Apostolou Plaintiffs moved the bankruptcy court to clarify whether its ruling applied to all parties and claims in the district court cases, including the additional plaintiffs. The bankruptcy court entered a clarification order to this effect on November 8, 1994. The Notice of Appeal in this case, however, was filed October 28, 1994, prior to the disposition of the clarification motion. Therefore, the Judgment Order, as clarified, is technically not before this Court. The Notice of Appeal was entered on the docket by the Clerk of the United States District Court for the Northern District of Illinois on December 8, 1994, and assigned to this Court.

5. Several cases filed by investors defrauded by Thomas Collins, the debtor (a/k/a "Collins investors") are currently pending before several judges in this district. The lead case is numbered 94–CV–3876 and is assigned to Judge Aspen. This case is known to the parties (and will be referred to by this Court) as the "Geldermann lawsuit" because one of the adversary defendants in that case is Geldermann, Inc., the futures commission merchant ("FCM") through which Collins illegally traded third-party funds. The other district court cases, numbered 94–CV–

entered by the bankruptcy court prohibiting further prosecution of the district court cases.

The bankruptcy court held that the trustee has standing to bring the district court claims and stayed the investors' district court action. In particular, on October 12, 1994, Judge Sonderby ruled that:

1. The district court claims filed by appellants in *Apostolou, et al. v. Geldermann, Inc., et al.*, No. 94 C 3876 (the "district court claims") are property of the debtors' estates (Lake States Commodities, Inc. and Thomas Collins) pursuant to 11 U.S.C. § 541;

2. The estate property belongs to the trustee and is covered by the automatic stay provision of Bankruptcy Code § 362.

3. Given this stay, the district court claims (as property of the estate) cannot be filed or prosecuted by anyone other than the trustee, who has standing to bring (or not to bring) those claims on behalf of the estate pursuant to 11 U.S.C. § 544 (in capacity as creditor trustee may file suit to reach property that belongs to debtor).

4. The appellants are enjoined from pursuing the district court claims, pursuant to 11 U.S.C. § 105 of the bankruptcy code.

5. The appellants' motion to dismiss the adversary complaint, No. 94 A 1339, filed by the trustee to enjoin the prosecution of the district court cases, is denied.

Judge Sonderby found that the Seventh Circuit narrowly construes the direct injury requirement in favor of the trustee in suits by creditors who are injured by third parties, holding that a creditor has standing only if it can articulate that it suffered an "additional injury" to the one suffered by the corporation. Otherwise, the creditor's injury is merely derivative and the trustee, acting on behalf of the estate, has exclusive standing to bring suit.

Judge Sonderby held that the trustee in this case has exclusive standing to bring the district court claims asserted by the appellants in this case because she believed that the Ponzi scheme directly injured Lake States, *i.e.*, the non-debtor third-party defendants took actions which resulted in Lake States being stripped of its assets by Collins.[6] Apparently, this ruling was based on her conclusion that the facts of this case fall within a line of cases where the creditor plaintiffs' injuries are derivative of those suffered by the bankrupt corporation, relying on *Wooten v. Loshbough*, 951 F.2d 768 (7th Cir. 1991), rather than both derivative and direct as in *Banker's Trust v. Rhoades*, 859 F.2d 1096 (2d Cir.1988), *cert. denied*, 490 U.S. 1007, 109 S.Ct. 1642, 104 L.Ed.2d 158 (1989), because "the monies invested with the debtor as a result of the alleged fraud are property of the estate and actions to reclaim these funds must necessarily belong to the estate." Oral Ruling at 7. Judge Sonderby further found that, "[t]he causes of action asserted in the district court complaint are property of the estate because the actions of the debtors' associate[s] resulted in depletion of the debtors' assets and the invested funds. The result was a direct injury to the debtor and only indirect injury to the creditors. The trustee therefore has standing to bring these causes of action...." Oral Ruling at 8.

4375; 94–CV 4631; 94–CV–6371; 94–CV–7565; 95–CV–1114; 95–CV–3172; 95–CV–3292; 95–CV–3293; 95–CV–3325; 95–CV–3403; 95–CV–3531, are assigned to Judges Duff, Manning, Bucklo, Marovich, Aspen, Shadur, Hart, Nordberg, Marovich, Marovich and Norgle, respectively. Although the plaintiffs in these cases are various investors defrauded by Collins and his co-conspirators, each of these cases name Geldermann and the other defendants who were alleged to have participated in and assisted Collins with his fraudulent scheme, namely: Daniel

J. Collins, Edward M. Collins, James J. Collins, Patricia Collins, John Matthews, Bernard Miraglia, James Spentzos and John R. Wade.

6. Judge Sonderby was clearly contemplating an alter ego or fraudulent transfer action by the trustee. However, the investors do not seek to bring those claims. Rather, they are merely seeking compensation for breach of individual duties by the defendants.

It is easy to see why the bankruptcy judge reached this result. According to the trustee, Lake States currently possesses approximately 2 million dollars of the defrauded investors' funds, two percent of the 100 million the trustee asserts was taken by Collins during the course of the Ponzi scheme. The investors concede that they purchased an interest in the "Lake States pool" and thus stand as creditors of the now bankrupt corporation administered by the trustee. As creditors of Lake States, these investors' injuries are common:[7] they stem from the same fraudulent actions taken by Collins and his co-conspirators to pool money in the corporation, misuse the corporation for fraudulent purposes and then loot the corporation for personal gain, leaving it bankrupt. To allow the creditors to bring individual suits against the non-debtor third-party co-conspirators who have not yet disappeared (as Collins did) would, in the bankruptcy judge's opinion, subvert one of the principle goals of bankruptcy: to permit the trustee to marshall the estate's remaining assets for equitable distribution among all the creditors, rather than permitting the swiftest creditors to obtain a judgment at the expense of other creditors with equally compelling claims.

On October 21, 1994, a final judgment was entered on these rulings, pursuant to Fed.R.Bankr.P. 7054(a). This appeal is taken from that judgment, and this Court has appellate jurisdiction under 28 U.S.C. § 158(a). The order appealed from was entered in a "core" proceeding within the meaning and purview of 28 U.S.C. § 157(b). In all appeals from such orders, conclusions of law are reviewable *de novo* and findings of

fact will not be set aside unless clearly erroneous. Fed.R.Bankr.P. 8013. This appeal comes to us on stipulated facts (with one exception).[8] The Court therefore has conducted a *de novo* review and finds that the bankruptcy court's legal rulings should be reversed and the injunction lifted.

The Court is aware that these equitable policies favor the result reached by the bankruptcy judge. Equity, however, follows the law, *Amazing Enterprises v. Jobin,* 136 B.R. 271, 278 (1992), and after considerable review, this Court must conclude that the legal principles set out above, when applied to the stipulated facts of this case, do not warrant the judgment entered by the bankruptcy judge.

## I. Background

In 1984, Thomas Collins incorporated Lake States for the alleged purpose of trading commodity futures for its own account. Amended Complaint[9] ("AC") ¶ 20. Sometime between 1984 and 1986, Collins and his accomplices began receiving customer funds and pooling those funds for the purpose of trading commodity futures, even though none of them were registered with the Commodities Futures Trading Commission ("CFTC") as futures commission merchants ("FCMs") or commodity pool operators ("CPOs"). AC ¶ 21. At the same time, Collins began making the trading decisions for the investors' funds even though he was not registered with the CFTC as a commodity trading advisor ("CTA"). AC ¶ 22. Collins pooled these funds in what the parties refer to as the "Lake States pool." AC ¶ 21. Although

---

7. There are, however, additional creditors of Lake States who were not defrauded in the alleged Ponzi scheme.

8. Although the bankruptcy judge did not make any findings of fact when she stayed and enjoined further prosecution of the district court cases, on appeal the parties disagree as to whether the record supports the appellee's position that the investors' funds were invested with Lake States. The absence of a finding by the bankruptcy court on this factual issue is not material to this Court's review since the parties agree that

the investors' funds were used by Collins in the Lake States pool.

9. All citations to the Amended Complaint refer to the district court complaint filed in Judge Aspen's court against Geldermann and eight individual non-debtor defendants ("Geldermann Complaint"). The original Geldermann Complaint made essentially the same allegations and the amendment was designed primarily to add 70 more plaintiffs. The trustee's Adversary Complaint was based on the original complaint.

Lake States was a corporation validly formed by Collins for the legal purpose of trading commodities futures, the fact that Collins did not register the corporation or its employees with the CFTC made the pooling of investor funds to trade commodity futures for its own accounts illegal. AC ¶ 125. In other words, Lake States never did any legitimate business as a futures commodity merchant, nor did it operate as a legitimate trading pool. AC ¶¶ 26, 125–127. Instead, Lake States, owned by Collins and his co-conspirators, operated merely as its own investor by trading commodities with several accounts at Geldermann Inc. ("Geldermann"), a registered FTM and legitimate trading pool. AC ¶¶ 8–9.

The scheme, as alleged by the Apostolou Plaintiffs, went something like this: Lake States maintained a public office in Rolling Meadows, Illinois, which prominently displayed the Lake States sign and electronic commodities tickers. AC ¶¶ 7, 25. Inside the office, most of the commodity pool sellers and other employees were stationed in computer-equipped offices where they regularly transacted business with Lake States pool investors. AC ¶ 25. These investors regularly visited the Lake States office where Collins and his co-conspirators, operating as *de facto* CPOs, were soliciting, receiving and trading customer funds. *Id.* When Collins and his accomplices received customer funds, they would pool these funds into several Lake States accounts and trade at Geldermann in the name of Lake States. AC ¶ 31.

In approximately late 1989 or early 1990, the CFTC, which was conducting an investigation of the Lake States' commodity pool sellers' previously described illegal commodity pool activities, requested Geldermann to provide copies of account statements and other records for commodity futures trading accounts associated with Thomas Collins and Lake States. AC ¶¶ 30–31. The account statements produced by Geldermann showed that Thomas Collins was associated with numerous accounts at Geldermann as the sole owner or as a joint owner with the other Lake States commodity pool sellers. AC ¶ 31. The records further reflected large deposits into and withdrawals from these Geldermann accounts. *Id.* For example, an account held solely in Thomas Collins' name showed more than $3,148,000 in deposits and $3,574,000 in withdrawals during the period from January to September of 1989. *Id.* Moreover, checks issued by Geldermann to Thomas Collins were endorsed over to various individuals, now named as defendants in the Geldermann Complaint. *Id.*

The Apostolou Plaintiffs assert that they made investments with the commodity pool sellers because they were told that current investors were making substantial returns; current investors reported substantial gains without any reported losses; the account statements distributed by the commodity pool sellers confirmed these facts; the commodity pool sellers disclosed no risks; and the current investors reported no difficulty in withdrawing purported profits from their pool accounts. AC ¶ 123.

In addition, the commodity pool sellers promised to and in most instances did provide the investors with documents entitled "Promissory Note" which were signed by Collins as receipts for the invested funds. AC ¶ 124. When the investors questioned the conspirators about the use of these "Promissory Note" documents to memorialize their investments, Collins and his accomplices told them that these notes were a "legitimate way to structure investments to save on commissions charged by the FCM." *Id.*

In June 1994, certain events led to the discovery that Collins had been running a Ponzi scheme for several years whereby he and his accomplices fraudulently induced hundreds of people to invest money with him so that he could pool the invested funds to trade commodity futures. AC ¶ 128; Joint Status Reports. When the investors learned that Collins had not established a legitimate

commodity pool,[10] that Collins had been falsely reporting profits to investors as a means of inducing new investments and that Collins had disappeared, two separate actions were filed:

1. Some of Collins' investors filed involuntary bankruptcy petitions against Collins (No. 94 B 12125) and against a corporation he formed, Lake States Commodities, Inc. (No. 94 B 12123); and

2. Some of Collins' investors filed a district court lawsuit (No. 94 C 3876) against Geldermann, Inc., ("Geldermann") the clearinghouse or futures commission merchant ("FCM") through which Collins illegally traded third-party funds, and various individuals who solicited sales of interests in the commodity pool operated by Collins ("commodity pool sellers"). The district court lawsuit alleges claims of securities, commodities exchange RICO and common law fraud[11] and seeks an award of damages to compensate the investors for their actual losses.

Joint Status Reports.

Shortly after the appellants filed the Geldermann Complaint, the trustee in the jointly administered bankruptcy proceedings (Nos. 94 B 12125 & 94 B 12123) filed an Adversary Complaint (No. 94 A 1339) against the appellants raising the issue of who has standing to pursue the claims alleged in the district court case against Collins' co-conspirators, none of whom are debtors in the bankruptcy proceedings. *Id.* Appellants filed a Motion to Dismiss the Adversary Complaint which the bankruptcy court denied. *Id.* This appeal followed.

## II. DISCUSSION

The issue in this case, simply stated, is whether the district court claims are property of the debtor estates under section 541, thereby giving the bankruptcy trustee exclusive standing to pursue them as a creditor *on behalf of* the estate under section 544, or whether these claims belong to the individual investors. A *de novo* review of the applicable legal principles establishes the following guidelines.

### A. Introduction

By definition, the property of a bankrupt estate is a scarce commodity. The assets of the debtor are no longer sufficient to fully repay its creditors and these creditors, eager to assert their full entitlement to the remaining assets, often lay claim to this property by filing competing claims outside bankruptcy. *See generally, Wooten v. Loshbough*, 951 F.2d 768, 770 (7th Cir.1991) (creditor sought "to jump the queue—to bypass bankruptcy—to wrest [a] valuable corporate asset from the trustee by suing the defendants [non-debtor third-parties] directly."). A trustee, therefore, is appointed by the bankruptcy court to administer the debtor's estate. 11 U.S.C. §§ 321, 323. As the administrator of the bankrupt estate, the trust-

---

**10.** Collins' accomplices were not registered with the CFTC as FCMs or CPOs. Nor was Collins registered with the CFTC as a CTA. Lakes States itself was held out to be, but was in fact not, a bona fide FCM or CPO, as defined in §§ 1a(12) and 1a(4), respectively, of the Commodities Exchange Act ("CEA"), 7 U.S.C. § 1 *et seq.*

**11.** In this Complaint the investors allege that they are entitled to rescission damages for defendants' violations of sections 4d, 4b, 4o and 13(a) of the Commodities Exchange Act (the "CEA"), section 12(2) of the Securities Act of 1933 ("the 1933 Act"), section 15 of the 1933 Act, Section 10(b) and Rule 10b–5 of the Securities Act of 1934 ("the 1934 Act"), section 20(a) of the 1934 Act and sections 1962(c) and 1962(d) of the Racketeering Influenced and Corrupt Organization Act ("RICO"). AC ¶ 1. The defendants in that action include: Geldermann, an Illinois corporation that is now and was at all relevant times registered with the CFTC as an FCM; officers, directors and shareholders of Lake States, *i.e.*, Edward Collins (shareholder/director), Daniel Collins (shareholder/director), James Collins (director), Bernard Miraglia (shareholder/director), and John Wade (shareholder/director), John Matthews (shareholder). Patricia Collins and James Spentzos shared the Lake States office and maintained a joint commodity interest trading account at Geldermann with Collins. AC ¶¶ 10–17.

ee is charged with marshalling all available assets of the estate, reducing these assets to money, and distributing this money to the estate's creditors, 11 U.S.C. §§ 704(1), in a manner that ensures each similarly situated creditors of the bankrupt debtor an equitable share.[12] *Sampsell v. Imperial Paper & Color Corp.*, 313 U.S. 215, 219, 61 S.Ct. 904, 907, 85 L.Ed. 1293 (1941). Therefore, the trustee, like the creditor, is also concerned with laying claim to any property that could conceivably belong to the estate. The trustee's concern, however, is based on a desire to avoid numerous lawsuits by individual creditors racing to the courthouse to deplete the available resources of the estate and thereby thwart the equitable goals of the bankruptcy laws. *In re MortgageAmerica Corporation*, 714 F.2d 1266, 1274 (5th Cir.1983).

To accomplish these goals, the trustee is given statutory power to sue and be sued as a representative, 11 U.S.C. § 323, and a creditor of the estate, 11 U.S.C. § 544. These broad powers are designed to streamline litigation affecting the estate by bringing it under the trustee's exclusive control. Moreover, the filing of a bankruptcy petition operates as an automatic stay of "any act [by anyone other than the trustee] to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3).

■ The automatic stay, however, is not absolute. Although the term "any act" includes a lawsuit brought by someone other than the trustee who claims an entitlement to estate property, property associated with the estate does not necessarily belong to the

estate. Rather, a series of legal determinations must be made before reaching the conclusion that an asset belongs to the estate and is controlled by the trustee.

■ The question "what constitutes estate property," therefore, cannot be answered simply by resort to statutory definitions, although we will begin there. The Bankruptcy Code creates the bankruptcy estate and defines property of the estate as "all legal and equitable interests of the debtor in property as of the commencement of the case."[13] 11 U.S.C. § 541. The term "all legal and equitable interests" has been defined broadly to include causes of action. *In re Matter of Educators Group Health Trust*, 25 F.3d 1281, 1283 (5th Cir.1994) (citing cases).

■ A cause of action is property of the estate if the debtor could have asserted the claim on its own behalf under state law, *Koch Refining v. Farmers Union Central Exchange Inc.*, 831 F.2d 1339, 1342, 1344 (7th Cir.1987), *cert. denied*, 485 U.S. 906, 108 S.Ct. 1077, 99 L.Ed.2d 237 (1988) ("[s]tate law determines whether property is an asset of the debtor"), before the bankruptcy petition was filed. *See* 15 COLLIER ON BANKRUPTCY, ¶ 541.04 at 541–22 (15th ed. 1989) ("the critical time as of which the property comprising the estate is to be determined ... is the date upon which the petition is filed"); *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir.1991) (same).

■ The debtor's right to bring a cause of action, however, is dependent upon whether a debtor has standing to sue.[14] A debtor, like others, is entitled to assert a cause of action if it has suffered a cognizable

---

**12.** This system recognizes that

> ... the purpose of the Bankruptcy Act is to bring about equality of division of assets amongst creditors. For the rule that to the diligent creditor belongs the reward, the act substitutes the rule that equality is equity.

*Canright v. General Finance*, 35 F.Supp. 841, 844 (E.D.Ill.1940).

**13.** Commencement of the case refers to filing of the bankruptcy petition under 11 U.S.C. §§ 301, 302, 303.

**14.** In bankruptcy cases, the standing requirement is virtually inseparable from the question whether a particular cause of action constitutes property of the estate. For instance, to say that a debtor had standing to bring a cause of action on its own behalf *before* bankruptcy is tantamount to saying that this same cause of action constitutes property of the estate *after* bankruptcy, which the trustee has exclusive standing to claim on behalf of the estate.

injury, as defined in *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). The injury requirement, known as "standing," is derived from Article III of the United States Constitution, which requires that a party seeking judicial resolution of a case or controversy have standing to present his claim. *Warth v. Seldin*, 422 U.S. 490, 500, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975).

■■■■ If a cause of action belongs to the estate, then the trustee has exclusive standing to assert the claim in his capacity as · creditor, 11 U.S.C. § 544; *Steinberg v. Buczynski*, 40 F.3d 890, 893 (7th Cir.1994) (trustee confined to enforcing entitlements of the estate); *Matter of S.I. Acquisition, Inc.*, 817 F.2d 1142, 1153–54 (5th Cir.1987) (same), and the automatic stay applies, barring anyone else from bringing the cause of action because it belongs to the debtor as property of the estate. If the cause of action belongs solely to the creditors, however, then the trustee has no standing to bring suit, *Steinberg*, 40 F.3d at 893 (trustee has no right to enforce direct entitlements of creditor); *Koch Refining*, 831 F.2d at 1348 (trustee does not have standing to bring personal claims of creditors), and the automatic stay does not apply.

■■■■ In bankruptcy, the issue of standing depends upon the type of injury suffered by the person or entity asserting the cause of action. If the cause of action is based on an injury inflicted by a third-party, then the court must determine whether the third-party's actions were directed to the estate or to the individual. If the estate is a corporation and the individual is a creditor of the corporation, the issue of standing becomes somewhat complex. The critical question, however, is whether the individual asserting the action seeks to recover *as a creditor of the corporation* in bankruptcy. See *Dana Molded Prods. Inc. v. Brodner*, 58 B.R. 576, 578 (N.D.Ill.1986).

■■ There is a difference between a creditor's interest in claims held by the corporation against a third party, which are enforced by the trustee, and the direct—rather than derivative—claims of the creditor against the third-party, which only the creditor can enforce. *Steinberg*, 40 F.3d at 893; *Shearson*, 944 F.2d at 118. A creditor is entitled to relief against a third-party if its injury does not merely flow from its status as an estate creditor, but has its genesis outside bankruptcy. *Id.* The difference plays out in cases, like the one presently before us, where the estate is a bankrupt corporation used by third-parties as an instrument to conduct personal business. *See Koch*, 831 F.2d at 1354 (Cudahy, J. concurring in part and dissenting in part).

## B. The Case Law

■■ The investors in this case are creditors of Lake States, a corporation which is now a bankrupt estate administered by a trustee. The investors, however, are also individuals who have allegedly been injured by the fraudulent acts of non-debtor third-parties (Collins' co-conspirators) who used Lake States as an instrument to perpetrate its Ponzi scheme for personal gain. There is a well-established rule of law in bankruptcy, namely, that a bankruptcy trustee has no standing to bring third-party claims that belong solely to the estate's creditors. *Caplin v. Marine Midland Grace Trust Co. of New York*, 406 U.S. 416, 428, 92 S.Ct. 1678, 1685, 32 L.Ed.2d 195 (1972). In the words of Judge Shadur: "fraud on investors that damages those investors is for those investors to pursue—not the [trustee]. By contrast, fraud on the [corporate] entity that operates to its damage is for the [trustee] to pursue...." *Scholes v. Schroeder*, 744 F.Supp. 1419, 1422 (N.D.Ill.1990). There are three lines of cases [15] that address this principle in the context of these facts.

The first line of cases can be characterized as derivative actions. In these cases, a third-

---

**15.** There are also other cases that are related to, but do not directly bear on, the decision in this

case. For instance, there are cases where the bankrupt corporation has not been directly in-

party injures a corporation causing it to go bankrupt. For instance, officers or directors loot the corporation, sending it into bankruptcy, and the creditors of the corporation seek to bring an alter ego action against the non-debtor third-party officers outside bankruptcy to recover personal assets. In this situation, the trustee alone would have standing to sue the third-party officers because the fraudulent actions were directed at or taken against the corporation, not the creditors. Although the creditors suffer an injury, this injury is derivative of the injury suffered by the corporation because the creditors would not have a cause of action but for their status as creditors. *See Wooten v. Loshbough*, 951 F.2d 768, 770 (7th Cir.1991) (trustee had exclusive standing to assert judgment creditor's RICO claim against bankrupt corporation looted by officers and third-party accounting firm for personal gain); *Koch Refining v. Farmers Union Central Exchange, Inc.*, 831 F.2d 1339 (7th Cir.1987) (creditors of bankrupt corporation did not have standing to assert alter ego action against corporate fiduciaries because corporation directly injured by member-owners'· breach of fiduciary duty and creditors' injury based on the same claim was derivative); *In re MortgageAmerica Corp.*, 714 F.2d 1266, 1275 (5th Cir.1983) (trustee, rather than bank creditor, had standing to assert state law alter ego claim against bankrupt corporation's fiduciary for fraudulent transfers to third-parties); *Mitchell Excavators Inc. v. Mitchell*, 734 F.2d 129, 131 (2d Cir. 1984) (corporate estate owned alter ego claim for breach of fiduciary duty by its officers under state law); *St. Paul Fire and Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688 (2d Cir.1989); *In re Matter of S.I. Acquisition, Inc.*, 817 F.2d 1142 (5th Cir.1987); *Dana Molded Products*, 58 B.R. at 579 (trustee had exclusive standing to bring RICO claim against fiduciary of corporation for fraudulent transfers of creditors' money because creditors injury derivative of harm to corporation).

The second line of cases is characterized by the presence of multiple and distinct injuries. In these cases, the creditor of a bankrupt corporation seeks to assert a claim against a third-party based on actions the third-party took directly against the individual creditor, even though this same third-party also injured the corporation, sending it into bankruptcy. Although the creditor's injuries are both direct and derivative, courts have held that an individual creditor may pursue a cause of action against a third-party outside bankruptcy for the direct injuries that the creditor, rather than the corporation, suffered. The fact that the injury to a single creditor is shared by and common to many other estate creditors does not give standing to the trustee of the bankrupt corporation to sue on behalf of the estate. The key factor determining standing in these cases is whether the corporation and the creditors have sustained injury due to the *same actions* of the non-debtor third-party. If the third-party has directed distinct actions at the creditor causing additional (or what is sometimes referred to as "personal and peculiar") [16] injury, then the trustee has no standing to assert the claims arising from these injuries. *See e.g., Ashland Oil, Inc. v. Arnett*, 875 F.2d 1271, 1280 (7th Cir.1989) (although plaintiffs, as creditors of the bankrupt corporation had derivative injury caused by diversion of corporate assets as part of the underlying scheme, another part of the scheme involved separate acts taken against creditor plaintiffs that cased a "significantly different" and therefore direct injury for which plaintiffs were given standing to sue outside bankruptcy); *Bankers Trust*, 859 F.2d at 1101 (creditors and estate had both concurrent and independent standing to bring RICO claims against the debtor's officers and directors). Thus, creditors are not required to forfeit their claims to the bankrupt estate if they have suffered an injury distinct from or in addition to the injury the corporation suffered due to the same third party, *Wooten*, 951 F.2d at 770; *Ashland Oil,*

jured by a third-party fiduciary, but a creditor has been injured, *see, e.g., Steinberg v. Buczynski*, 40 F.3d 890 (7th Cir.1994).

**16.** *See Koch*, 831 F.2d at 1348.

875 F.2d at 1280; *Bankers Trust*, 859 F.2d at 1099, 1101, even if the creditor also has an ultimate derivative interest in the estate, *Scholes*, 744 F.Supp. at 1422–23.

This case falls within a distinct third line of cases.[17] In these cases, the primary characteristic is the involvement of the bankrupt corporation *in pari delicto*[18] with the other players orchestrating fraudulent or otherwise illegal schemes. The players in these cases generally include a bankrupt corporation, creditors who have invested in that corporation, and non-debtor third-parties who have committed the fraud that has caused injury. Many of these cases also involve Ponzi schemes where investments are solicited by using worthless promissory notes as guarantees. The difference between these cases and the two lines of cases described above is that the debtor corporation, although in bankruptcy, has not sustained injury as a victim of the fraud but is injured, if at all, only because it participated *in pari delicto* in the fraudulent scheme as a corporate co-conspirator and was the subject of an involuntary bankruptcy petition when the scheme went sour. *See Caplin*, 406 U.S. at 434, 92 S.Ct. at 1688 (trustee in Chapter 10 reorganization had no standing to sue indenture trustee who allegedly permitted corporation to violate indenture on behalf of holders of debentures issued by the corporation); *Shearson Lehman*, 944 F.2d at 118 brokerage house where principal sold worthless notes and loan agreements to fellow church members, and used the proceeds to make stock trades in the name of his wholly-owned corporation, which subsequently went bankrupt); *E.F. Hutton & Co., Inc. v. Hadley*, 901 F.2d 979 (11th Cir.1990) (trustee did not have standing to assert creditors claims where debtor corporation and third-party were *in pari delicto* during course of Ponzi scheme); *Williams v. California 1st Bank*, 859 F.2d 664, 666 (9th Cir.1988) (trustee lacked standing to sue third-party bank for securities fraud violations arising from bank's alleged participation in, knowledge of and approval of debtor's Ponzi scheme, where bank held funds collected from investors by use of promissory notes); *Amazing Enterprises v. Jobin (In re M & L Business Machines Co.)*, 160 B.R. 850 (D.Colo.1993) (affirming 136 B.R. 271, 274, 277 (Bankr. D.Colo.1992) where bankruptcy court held that trustee lacked standing to assert state law claims arising out of Ponzi scheme where corporation in bankruptcy was *in pari delicto* with the third-party defendants); *Cagan v. West Suburban Bank*, No. 90 C 5582, 1992 WL 80966, * 3 (N.D.Ill. April 15, 1992) (Rovner, J.) (receiver lacked standing to assert creditor claims because limited partnerships in which creditors purchased interests were merely vehicles for the third-party perpetrators' fraud and "were never treated as separate, legitimate entities in their own right" and "limited partnerships were not themselves the victims of fraud, but rather were the means to that end."). The rule in these cases is that "when a bankrupt corporation has joined with a third party in defrauding its creditors, the trustee cannot recover against the third party for the damage to the creditors." *Shearson Lehman*, 944 F.2d at 118 (citing cases). *Cf. Feltman v. Prudential Bache Securities*, 122 B.R. 466 (S.D.Fla. 1990); *In re Ozark Restaurant Equip. Co., Inc.*, 816 F.2d 1222 (8th Cir.1987).

The bankruptcy court's opinion in *Amazing Enterprises v. Jobin*, 136 B.R. 271 (Bankr.D.Colo.1992), affirmed with no additional reasoning by the district court, 160 B.R. 850 (D.Colo.1993), illustrates these principles and is noteworthy for its facts and for its reasoning. In a Ponzi scheme, creditor plaintiffs lent money to M & L, a corporation purportedly designed to purchase large quantities of computer equipment at signifi-

---

**17.** Unlike our esteemed colleague in the bankruptcy court who believed that this case fell squarely in the first line of cases, this Court has concluded that the case falls within the third. As a district court judge, however, this Court has the utmost respect for his colleague and is very mindful of the "battlefield" decisions that are often made in the bankruptcy court.

**18.** The term "in pari delicto" is defined as: in equal fault; equally culpable or criminal. BLACK'S LAW DICTIONARY 791 (6th ed. 1990).

cant discounts. The creditors were told that they would earn high interest (10% per month or 120% per year) for the corporation's use of their money. 136 B.R. at 273. In exchange for the loan, the creditors' received interest bearing promissory notes for the investment plus interest. *Id.*

On cross-motions for summary judgment, the bankruptcy court entered judgment for the creditor plaintiffs, holding that the plaintiffs, rather than the trustee, had standing to assert state law securities fraud claims against non-debtor third-parties who were part of the scheme. *Id.* at 277. The facts of the case were largely stipulated and the parties conceded that there were grounds to both disregard the corporate entity and to find that the third-parties, acting as brokers, solicited the plaintiffs to place their money with the bankrupt corporation. *Id.* at 273. The Bank of Boulder was also named as a third-party defendant for "control person" and "aider and abettor" liability under securities fraud laws. *Id.* The issue before the bankruptcy judge was whether the plaintiffs were precluded from pursuing their own state law claims against the third-parties and entities allegedly responsible for their investments in the corporation. *Id.* at 274.

The trustee argued that the plaintiff's claims against the bank and other individuals and entities were assets of the estate as defined by 11 U.S.C. § 541. The trustee then offered several theories for this position:

1. The plaintiff investors were similar to creditors;

2. The RICO and related actions involved injuries derivative of those suffered directly by the corporation. Therefore, plaintiffs did not have standing to assert them because these injuries were not "peculiar and personal" to the plaintiffs, but rather "general" and "common" to the corporation and other creditors. *See Koch,* 831 F.2d at 1348; and

3. The policy behind the Bankruptcy Code weighs in favor of allowing only

the trustee to pursue these claims so that all similarly situated creditors will be treated alike. Given their power under section 544, a trustee can pursue a creditor's claims on their behalf, thereby avoiding the problems of multiple liability and the specter of one creditor recovering a fund at the expense of all creditors.

*Id.*

Similarly, the plaintiffs' claims in *Jobin*—like the appellants' claims in our case—argued that they were not creditors of the bankrupt estate, that their claims were not assets of the estate and that the trustee had no standing to sue third parties with regard to the plaintiffs' claims. *Id.* In support of their position, plaintiffs advanced the following theories:

1. The Bankruptcy Code does not generally provide a trustee with the power to enforce claims on behalf of creditors against a third party.

2. Because the corporation was *in pari delicto* with the defendants, it would not have its own claim against them for violations arising from the Ponzi scheme.

3. Even assuming their injury is derivative, not every derivative injury creates a right for all creditors to sue. For example, to be successful in their claims for securities fraud violations, each plaintiff is required to prove their respective reliance and injury.

4. The underlying purposes of the Bankruptcy Code would not be furthered by allowing the Trustee to recover funds for the estate to be shared generally by creditors who could not pursue their individual fraud claims.

*Id.* at 274–75.

The arguments of the parties are essentially those raised by the parties' in this case. The bankruptcy court's rulings, therefore, are particularly relevant to the decision in this case.

*Jobin's* analysis began by highlighting the *Caplin* holding, namely, that a trustee cannot

pursue a creditors' personal claims against third-parties.[19]  *Id.* at 275 (citing *Caplin*, 406 U.S. at 428, 92 S.Ct. at 1685).  In addition, the court relied on *Caplin* for the proposition that a debtor estate (and therefore the trustee) has no claim against a party or an entity who probably was *in pari delicto* with the debtor.  *Id.*  According to the *Jobin* court, these standing limitations eliminate bankruptcy asset distribution problems which may arise when creditors who were not injured by actions of third parties are able to receive the benefit of the trustee's recovery.  The limitation also prevents conflicts over the binding effect of judgments and settlements by a trustee on creditors who have a right to sue in their own name.  *Id.* at 275.

■ The *Jobin* court then found, consistent with the decisions in *Caplin* and its progeny, that the trustee's arguments were meritless.  First, the plaintiffs' claims were not similar to creditors' claims because they were "based upon particular and distinct injuries," which needed "to be proven individually for the collection of damages."  *Id.* at 276.  Second, the corporation had creditors other than the plaintiffs with dissimilar claims and thus the trustee did not have standing to assert the plaintiffs' claims on behalf of "all" creditors.  *Id.*  Third, the

trustee's argument that the plaintiffs' claims were derivative of the corporation's injuries caused by the third party defendants only addressed part of the picture: "while it is true that the actions of the third parties may have injured M & L, thus derivatively injuring all creditors, the plaintiffs' claims are based upon those actions which specifically injured the plaintiffs."  *Id.*  Fourth, the bankruptcy court distinguished the Seventh Circuit's ruling in *Wooten* on the grounds that the creditor in that case was not injured because he was the target of fraud but because he was a creditor of the looted corporation.  In *Jobin*, the court held, "the plaintiffs appear to have been the direct targets of ... fraud ... to obtain loans for M & L.  Thus, even under the rationale in *Wooten*, the creditors here would be allowed to proceed."  *Id.* at 276.  Fifth, the trustee's policy arguments were not persuasive because "the Bankruptcy Code is intended to provide for the fair and equitable distribution of an estate's assets."  It is not based upon a policy which permits a court to involve itself in judicial legislation and to deny permanently the due process rights of creditors to pursue their own claims against third parties.[20]

## C.  Analysis

■ We find, for substantially the same reasons articulated by the *Jobin* court, that

19.  The *Jobin* court, however, appears to have concluded that "there is a split of authority" on the issue of whether a trustee has standing to pursue creditors' claims for "money not owed to the estate."  *Id.* at 274 (citing *Caplin*, 406 U.S. at 428, 92 S.Ct. at 1685).  For the reasons set out in this opinion, we have concluded that this "split" results from different fact patterns rather than a disagreement among reasonable jurists about the law.  *See id.* (citing cases).

20.  The bankruptcy court also relied on one more ground related to the alter ego veil piercing theory, which is not applicable in our case because neither the appellants nor the trustee have asserted such a claim.  Several comments about the doctrine, however, are warranted.

In an alter ego action, the liability itself arises from fraud or injustice perpetrated not on the corporation, but on third parties dealing with the corporation.  1 *Fletcher Cyclopedia on the Law of Private Corporations* § 41.10 at 615 (1990 ed.).  As Judge Cudahy noted in his concurring opinion in *Koch*, 831 F.2d at 1353:

The doctrine of alter ego does not create assets for or in the corporation.  It simply fastens liability upon the individual who uses the corporation merely as an instrumentality in the conduct of his own personal business.  The liability springs from fraud.  The fraud from which it arises is not perpetrated upon the corporation, but upon third persons dealing with the corporation.

*Id.* (citing *Garvin v. Matthews*, 193 Wash. 152, 156–57, 74 P.2d 990, 992 (1938)).

In *Jobin*, the court found that, although the trustee is given broad statutory power under § 544, the power only extends to actions permitted under state law.  Apparently, in Colorado, unlike Illinois, "an alter ego action to pierce the corporate veil belongs to the creditors of the corporation, not to the corporation itself."  *Id.*  Cf. *Koch*, 831 F.2d at 1345.  To pierce the corporate veil, however, the third-party defendants must be fiduciaries of the corporation.  The record in this case does not definitively resolve whether all the defendants named by the plaintiffs in this case are fiduciaries of Lake States.

the trustee does not have standing to assert the district court claims alleged by the Apostolou Plaintiffs in the Geldermann case, because these claims are not property of the bankrupt estates.[21] First, the facts of this case, as alleged in both the Geldermann and the Adversary Complaints, fall into the third category of cases. Collins, the principle of the Ponzi scheme, and the third-party defendant brokers traded worthless promissory notes for cash investments promising the investors that they would pool the investors' money to trade commodities and produce a substantial monetary return. Although the investors gave their money directly to Tom Collins and Collins' co-conspirators (known as commodity pool sellers) by writing their checks to Collins and receiving cancelled checks with Collins' endorsement, the Geldermann complaint alleges (and therefore concedes) that the investors realized that the promissory notes they signed represented the "purchase of an interest in the Lake States Commodities pool." AC ¶¶ 33–121.

Lake States, however, was not a legitimate commodities trading pool; it served merely as an account or a set of accounts in which the conspirators pooled investors' money with Geldermann [22] in its own name. As such, Lake States was an instrument with which Collins and the third-party brokers effectuated their fraudulent scheme, rather than a fully-functioning corporation doing legitimate business which was simply misused and ultimately looted by its fiduciaries. Thus, although Lake States was a validly formed corporation, the fact that it never operated legally according to its charter, but instead was used as a means to defraud the investors, indicates that it is the investors— not the bankrupt estates—who are the real victims in this case. The estate of Lake States has not suffered an injury from the fraud;[23] it participated *in pari delicto* with Collins and the other third-party defendants as a corporate co-conspirator.

The courts in *Shearson Lehman, Williams, Jobin* and *Cagan,* held that there is no direct injury to a corporate entity that participates in a fraud, and we similarly conclude that there is no corporate injury here. The decisions in *Koch* and its progeny which hold that the trustee has standing to sue on behalf of the corporation's creditors do not apply in this case because the appellants are not merely creditors whose injuries arose out of their status as creditors of Lake States. Unlike the creditors *Koch* and *Wooten,* the appellants in this case were targets of the Ponzi scheme and suffered injuries that Lake States could not have suffered as a participant in that scheme. The fact that the appellants may also be regarded as creditors of Lake States does not alter the decision we have reached but merely indicates that this case may, in the alternative, also fall into the second line of cases, since the appellants may have both a derivative and a direct injury. The appellants' claims, therefore, do not belong in bankruptcy and should not be subject to the automatic stay.

## CONCLUSION

Lake States was not a victim of fraud. Tom Collins and the third-party defendants did not target their fraudulent actions against Lake States; they used it as an instrument to defraud the appellants, who were the principal targets of the Ponzi scheme. Moreover, Lake States never did any legitimate business; its sole purpose was to act as a conduit for the investors' funds. Although Lake States is now bankrupt, and therefore injured, because its accounts were

---

**21.** Neither party makes reference to the estate of Tom Collins, but merely refers to Lake States as the relevant estate for purposes of this appeal. This court has followed the same practice.

**22.** Geldermann is a proper third-party defendant, in much the same way that the Bank of Boulder was in *Jobin,* because it allegedly al-

lowed Collins to maintain this scheme even though it had knowledge that Collins was illegally trading commodities with customer money without being registered with the CFTC to do that sort of business.

**23.** The presence of non-investor creditors of Lake States does not alter this analysis with respect to the appellants' claims.

looted by Collins, the appellants' injuries do not flow from Lake States' injury. Lake States, in fact, is only injured because the investors were defrauded. Otherwise, it would not have had any money to be looted. Although Lake States was arguably injured by the scheme, Lake States was not the only target of the Ponzi scheme. The injury the investors suffered, therefore, was not merely derivative of any injury suffered by the Lake States corporation. We believe the injuries suffered by the appellants were direct because they were targets of a fraudulent scheme that included Lake States as a means to effectuate the goals of the conspiracy. *See Caplin v. Marine Midland Grace Trust Co. of New York,* 406 U.S. 416, 429–34, 92 S.Ct. 1678, 1685–88, 32 L.Ed.2d 195 (1972); *Shearson Lehman Hutton v. Wagoner,* 944 F.2d 114, 118 (2d Cir.1991); *Williams v. California 1st Bank,* 859 F.2d 664–66 (9th Cir.1988); *Amazing Enterprises v. Jobin,* 160 B.R. 850 (D.Colo.1993); *Cagan v. West Suburban Bank,* No. 90 C 5582, 1992 WL 80966, * 3 (N.D.Ill. April 15, 1992). In the alternative, the investors suffered both derivative injuries—as creditors of Lake States—and direct injuries—as targets of the Ponzi scheme of which Lakes States was a part. This "additional" injury gives the appellants standing to sue the third-party defendants under the auspices of *Ashland Oil, Inc. v. Arnett,* 875 F.2d 1271, 1280 (7th Cir.1989); *Bankers Trust Co. v. Rhoades,* 859 F.2d 1096, 1101 (2d Cir.1988).

The Clerk of the Court is therefore directed to REVERSE the judgments of the bankruptcy court denying the appellants motion to dismiss the adversary complaint and enforcing the automatic stay of the district court cases. This ruling effectively dismisses the Adversary Complaint filed in the bankruptcy court. The Court further directs the Clerk of the Court to lift the injunction entered by the bankruptcy court and to allow the appellants to proceed with their district court cases.

*MEMORANDUM OPINION AND ORDER*

The trustee seeks rehearing of the issues resolved by this Court in its Memorandum Opinion and Order of September 15, 1995, based on a decision issued by the Seventh Circuit, *Scholes v. Lehmann,* 56 F.3d 750 (7th Cir.1995), while this appeal was under consideration. In our opinion, we held that the trustee does not have standing to pursue the claims of the individual investors defrauded by Thomas Collins in a Ponzi scheme which utilized the now bankrupt Lakes States corporation as an instrument to perpetuate the fraud. This holding was based on our review of the *in pari delicto* defense and its application in cases like the one before us. We found that, although the Seventh Circuit had not directly addressed the viability of the defense in the context of a bankruptcy proceeding, several other circuit and district courts had and those decisions were persuasive (although not mandatory) authority.

## A. The In Pari Delicto Defense

The trustee's principal position in its motion for rehearing is that *Lehmann's* treatment of the *in pari delicto* defense is directly on point and therefore mandatory authority that this Court is required to follow. The trustee's position deserves careful consideration and, therefore, has been given due regard, but *Lehmann* is not directly on point. We recognize, however, that the standing analysis offered by the circuit court in *Lehmann* appears to speak directly to the issues at the heart of this case, namely, whether the bankruptcy trustee has standing to bring suit on behalf of defrauded investors of a bankrupt corporation when that corporation was used as an instrument to perpetrate the fraud. In fact, Chief Judge Posner, writing for the panel, clearly stated:

> Though injured by [the principal], the corporations would not be heard to complaint as long as they were controlled by him, not only because he would not permit them to complain but also because of their deep, their utter, complicity in [the principal's] fraud.

*Lehmann,* 56 F.3d at 754. And, of course, the trustee's favorite line in the opinion

states: "the defense of *in pari delicto* loses its sting when the person who is *in pari delicto* is eliminated." *Id.*

These isolated quotations, however, do not tell the whole story. *Lehmann* is about a corporation in receivership that allegedly transferred, by fraudulent conveyances (at the direction of the principal), some of the money invested with the principal of the Ponzi scheme. Although analogies between receivership and bankruptcy are useful, the analysis in *Lehmann* proceeds from the (questionable) assumption that any injury to the defrauded investors by the corporation in receivership during the fraud is removed once the principal controlling the corporation is removed. In Judge Posner's words, "[t]he appointment of the receiver removed the wrongdoer from the scene. The corporations were no more [the principal's] evil zombies. Freed from his spell they became entitled to the return of the moneys—for the benefit . . . of innocent investors—that [the principal] had made the corporations divert to unauthorized purposes." *Id.*

■ This reasoning has logical appeal: certainly corporate entities, although considered "persons" due to a legal (but functional) fiction, do not act apart from the real persons who control and direct them. A corporation, therefore, does not have its own fraudulent intentions apart from those instilled by its principals. Once those principals are "removed," as Judge Posner would say, the corporations are no longer culpable for the wrongdoing they were directed to perpetrate and therefore may receive funds for equitable distribution—on behalf of the investors rather than the perpetrators—that it formerly misused.

Although we recognize the appeal of this theory, we question its applicability in this case. The Seventh Circuit has decided that this reasoning makes sense in light of receivership and fraudulent conveyance cases. It is for this Court to decide, however, whether that reasoning applies in the context of the bankruptcy appeal before us. So far, *Lehmann's* analysis is limited to its facts. The

Seventh Circuit did not make a sweeping statement that the *in pari delicto* defense has no force in this circuit; it merely noted that the defense "loses its sting." *Id.* Nor did the circuit court distinguish any of the cases this Court relied on in support of its ruling that the *in pari delicto* defense applies in this case. Until the Seventh Circuit has decided the issue in the context of bankruptcy proceedings, addressing the precise issue of direct and derivative injury outlined in *Koch Refining v. Farmers Union Central Exchange Inc.,* 831 F.2d 1339 (7th Cir.1987), *cert. denied,* 485 U.S. 906, 108 S.Ct. 1077, 99 L.Ed.2d 237 (1988), and the other Seventh Circuit cases addressing that issue, *see Steinberg v. Buczynski,* 40 F.3d 890, 893 (7th Cir.1994); *Wooten v. Loshbough,* 951 F.2d 768, 770 (7th Cir.1991), this Court believes that the circuit court decisions cited in our Memorandum Opinion and Order are persuasive and controlling authority on the issue of the *in pari delicto* defense. We therefore deny the motion for rehearing because *Lehmann* does not require a different result.

## B. Additional Injury

The trustee's second argument is that the Court's reliance on the "additional injury" cases to support its decision is simply wrong. The trustee, however, fails to recognize the interdependence between the Court's finding regarding the *in pari delicto* defense and the "additional injury" cases. Assuming arguendo that the investors are creditors of the Lake States estate, the Court merely found in the alternative that "the appellants in this case were targets of the Ponzi scheme and suffered injuries that Lake States could not have suffered as a participant in that scheme." Mem.Op. at 972. These injuries are distinct from any that Lake States might have suffered because Lake States could not, either in truth or in fiction, have suffered the same injury that it helped inflict on the investors. Thus, even if the investors are found to be creditors of the bankrupt estate (a status they do not claim or dispute), they are also individual investors who have suffered a distinct and personal injury by the

bankrupt corporation and the third-parties who controlled it. The arrival of the trustee on the scene does not absolve Lake States of its role in the Ponzi scheme, at least not for purposes of determining whether the individual investors suffered a "direct injury." None of the cases cited by the trustee, including *Lehmann*, alter the Court's findings with respect to the alternative holding.

## CONCLUSION

Finally, we note that the trustee did not cite *Lehmann* in its original briefs, nor did it bring the case to the court's attention while the motions were under consideration. If *Lehmann* were clearly dispositive of the issues in this case, the trustee's failure to direct the court's attention to it earlier is unexplainable. We believe that *Lehmann* is not dispositive, and therefore direct the Clerk of the Court to deny the trustee's motion for rehearing.