Lawrence FISHER, as Trustee of the Estate of Lake States Commodities, Inc., a/k/a Lake States, Inc., and as Trustee of the Estate of Thomas W. Collins, Plaintiff–Appellant,

v.

Louis APOSTOLOU, et al., Defendants–Appellees.

No. 95–3762.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 4, 1997.

Decided Sept. 9, 1998.

John A. Simon, Lawrence Fisher (argued), Michael J. Hayes, Linda A. Green, Gardner, Carton & Douglas, Chicago, IL, for Debtor–Appellant.

Stephen B. Diamond, Lawrence W. Schad, David J. Philipps, Steven J. Tomiello, Beeler, Schad & Diamond, Chicago, IL, Edward T. Joyce, Arthur W. Aufmann (argued), Rowena T. Paras, Joyce & Associates, Chicago, IL, for Appellees.

Before CUDAHY, FLAUM, and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

Thomas W. Collins ran a bucket shop (a scam similar to a Ponzi scheme) for approximately ten years, along with a number of accomplices. After his fraud was detected, Collins disappeared, and both he and the principal corporate entity he had used for his bogus commodities business were forced into bankruptcy. (Collins later committed suicide after a botched bank robbery in San Diego.) This case presents the question whether claims that the defrauded investors have against the accomplices and against the futures commission merchant through which they conducted much of their business may be stayed for the duration of the bankruptcy proceeding. The bankruptcy court held that the trustee had standing to pursue the individual investors' claims and accordingly stayed their action in district court. See *Apostolou v. Fisher*, 188 B.R. 958, 962 & n. 4 (N.D.Ill.1995). On appeal, the district court found that the trustee did not have standing to assert those claims, because they were not "property of the estate" for purposes of Bankruptcy Code § 541, 11 U.S.C. § 541.

(Unless otherwise noted, all statutory sections mentioned are from the Bankruptcy Code, Title 11, U.S.Code.) It therefore found that the investors' claims were not subject to an automatic stay under § 362, or to the § 105 injunction imposed by the bankruptcy court. *Apostolou*, 188 B.R. at 971–72. We agree with the first of those conclusions, but following, by and large, the reasoning of the Second Circuit in *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096 (2d Cir.1988), we believe that the investors' claims are sufficiently related to property of the estate that their pursuit should be stayed pursuant to § 105 until the bankruptcy court has disposed of the trustee's claims based on the same underlying transactions. We therefore affirm in part and reverse and remand in part for further proceedings.

I

In 1984, Collins established Lake States as a corporation that would trade in commodities futures on its own account. That promise, however, was never fulfilled in any legitimate way. Neither Collins nor any of his colleagues—Daniel J. Collins, Edward M. Collins, James J. Collins, Patricia Collins, John Matthews, Bernard Miraglia, James Spentzos, and John R. Wade—ever registered with the Commodities Futures Trading Commission ("CFTC") as required by law. 7 U.S.C. §§ 1a, 6d, 6f, 6k, 6n. Instead, some time between 1984 and 1986, Collins and his accomplices began soliciting and accepting investments, which they converted to their own use through accounts at Gelderman, Inc., a registered futures commission merchant. (We shall occasionally refer to the accomplices, together with Gelderman, as the "Apostolou Defendants.") As with all such schemes, Lake States maintained the illusion of legitimacy and success by using funds from newer investors to pay "returns" to earlier investors. The CFTC smelled a rat in October 1989, which caused it to begin investigating the trading on Lake States' behalf at Gelderman. It learned that unusually large deposits and withdrawals had been taking place in the Lake States accounts at Gelderman: one account in Collins' name showed more than $3,148,000 in deposits and $3,574,000 in withdrawals from January to September 1989. At that point, however, the CFTC apparently took no action, and the scheme continued. In addition to the basic fraud, Collins and his accomplices gave their investor-victims "promissory notes" as receipts for their invested funds. The victims were told that the notes were a "legitimate way to structure investments to save on commissions" charged by Gelderman.

Everything unraveled in June 1994: Lake States became insolvent, Collins disappeared, the investors learned that they had been bilked, and the proceedings giving rise to the present appeal began. Some of the unfortunate investors filed involuntary bankruptcy petitions against Collins and Lake States, which by then had only some $2 million left of the $100 million they had taken in—hardly enough to satisfy the outstanding investor debt of about $64 million, not to mention any other obligations the two may have had. Another group, known as the "Apostolou Plaintiffs" (after Louis Apostolou, one of the defrauded investors), filed securities, commodities, and common law fraud suits against the Apostolou Defendants in federal district court. The ranks of the Apostolou Plaintiffs have now swollen to 244 named individuals and entities (according to the certificate of interest attached to their brief), who are suing individually, not as a class. The entire group of similarly situated investors numbers about 450. See generally *Apostolou*, 188 B.R. at 962–65.

The Apostolou Plaintiffs initially sued both the Apostolou Defendants and the two debtors in bankruptcy, Thomas Collins and Lake States. Before matters moved very far, however, and undoubtedly in recognition of the problems the automatic stay rule of § 362 posed for their claims against the two debtors, they voluntarily dismissed Collins and Lake States from their action. This move did not satisfy the trustee, who filed a "Complaint to Enforce the Automatic Stay, or in the Alternative, to Obtain Injunctive Relief" in the bankruptcy court. In his complaint, the trustee argued (a) that the Apostolou Plaintiffs' claims, including those against the Apostolou Defendants, were the property of the debtors' estates and subject to the § 362 automatic stay, and, in the alternative, (b) that the Apostolou Plaintiffs' claims were

sufficiently "related to" those of the trustee to support a § 105 injunction against the Apostolou Plaintiffs, staying their lawsuits until the trustee completed his pursuit of the Apostolou Defendants.

The Apostolou Defendants disagreed, but Bankruptcy Judge Susan Sonderby was not convinced that their remaining claims were sufficiently distinct from the bankruptcy proceedings that they should be allowed to go forward. Instead, in an order dated October 21, 1994, she concluded that the trustee had satisfied the requirements for an injunction under § 105, finding that both parties were pursuing the same dollars from the same defendants to redress the same harms, that the trustee was substantially likely to prevail on the merits, that there was no adequate remedy at law to protect the debtors' estates from the Apostolou Plaintiffs' actions, that the debtors' estates would suffer irreparable harm in the absence of a preliminary injunction, that the Apostolou Plaintiffs would suffer no harm from such an injunction (except perhaps loss of any benefits of being in the running in a race to the courthouse), and that an injunction would not harm any public interest.

The bankruptcy judge also decided, however, that the claims filed by the Apostolou Plaintiffs were the property of the debtors' estates under § 541, and thus that they were under the control of the trustee for purposes of § 544 and covered by the automatic stay of § 362. She announced that the request for a § 105 injunction was moot, but then enjoined the Apostolou Plaintiffs under § 105 from pursuing their claims against the two debtors' estates "until an order is entered in the ... jointly administered bankruptcy cases terminating, modifying or annulling said stay." Record 34, at 2; see also *Apostolou*, 188 B.R. at 962. Upon their appeal pursuant to 28 U.S.C. § 158(a), the district court disagreed with the bankruptcy court. It found that the claims were not the property of the bankrupt estates, and that the trustee accordingly did not have standing to assert the Apostolou Plaintiffs' various claims. The court concluded that the Apostolou Plaintiffs were entitled to proceed because Lake States was a party to the fraud, not its victim, and thus, under the *in pari delicto* doctrine, could not sue the Apostolou

Defendants (through the trustee). It reversed the judgment of the bankruptcy court and lifted the § 105 injunction.

II

If the Apostolou Plaintiffs were trying to sue the two debtors, it is beyond dispute that the action would fall within the terms of the § 362 automatic stay. The catch here is that they are suing third parties who are not in bankruptcy, and who allegedly committed various acts of fraud against them—nondebtor tortfeasors, as the Apostolou Plaintiffs label them. Even if the third parties—the Apostolou Defendants—injured Collins or the Lake States corporation, the Apostolou Plaintiffs argue that they too were injured independently by the same defendants, and they are therefore entitled to pursue their own actions outside of the umbrella of the bankruptcy proceeding.

We begin with a review of the kinds of claims that may be brought only by the trustee once a bankruptcy proceeding has begun. First, the trustee has the sole responsibility to represent the estate, by bringing actions on its behalf to marshal assets for the benefit of the estate's creditors. 11 U.S.C. § 323; *In re Perkins*, 902 F.2d 1254, 1257 (7th Cir.1990). Second, the trustee is also the only party who can sue to represent the interests of the creditors as a class. See *Koch Refining v. Farmers Union Central Exchange, Inc.*, 831 F.2d 1339, 1342–43 (7th Cir.1987) (citing § 544). *Koch* also points out, however, that the trustee has no standing to bring personal claims of creditors, which the court defined as those in which the claimant is harmed and "no other claimant or creditor has an interest in the cause." *Id.* at 1348.

[A]llegations that could be asserted by any creditor could be brought by the trustee as a representative of all creditors. If the liability is to all creditors of the corporation without regard to the personal dealings between such officers and such creditors, it is a general claim....

A trustee may maintain only a general claim. His right to bring a claim depends on whether the action vests in the trustee as an assignee for the benefit of creditors

or, on the other hand, accrues to specific creditors.

*Id.* at 1348–49 (internal citations and punctuation omitted); see also *Ashland Oil, Inc. v. Arnett*, 875 F.2d 1271, 1280 (7th Cir.1989) (RICO plaintiffs were entitled to sue on their own for injuries distinct from the injuries to creditors in general resulting from the diversion of corporate assets).

■ The trustee, acting on behalf of the estate or the creditors as a whole, obviously may not roam around collecting whatever property suits her fancy. Her task instead is to recover and manage the "property of the estate," which is defined in § 541. The nature of a debtor's interest in property is determined by state law, *In re A-1 Paving and Contracting, Inc.*, 116 F.3d 242, 243 (7th Cir.1997), but the question whether the resulting interest should count as "property of the estate" for § 541 purposes is an issue of federal law. *In re Marrs–Winn Co.*, 103 F.3d 584, 591 (7th Cir.1996). Here, we must decide whether the Apostolou Plaintiffs' claims against the Apostolou Defendants— Collins' accomplices and the Gelderman firm—are property of (or sufficiently closely related to the property of) either the Collins estate or the Lake States estate. The district court found that the Apostolou Plaintiffs could proceed with their own cases because both debtors were themselves wrongdoers, which destroyed any standing they may have had to recover from the defendants.

We put to one side for the moment the question whether the trustee as representative of Collins' estate could recover anything, because the analysis would be different from the one applicable to Lake States, a corporate body. With respect to the corporation, our starting point is this court's decision in *Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995). In *Scholes*, a Ponzi scheme case, a court appointed a receiver for Michael Douglas, the perpetrator of the scheme, and the three corporations he used for its implementation. The receiver, much like a trustee in bankruptcy, brought suits to recover assets that had originated with the sales of "shares" to the victims, and which had then been siphoned out of the corporations. One question was whether the receiver had standing under the Illinois law of fraudulent conveyances to sue to recover additional assets from

certain parties. This court concluded that he could bring the suit, even though at one point the corporations were themselves wrongdoers. Once Douglas had been ousted from control and the receiver had been appointed, "[t]he corporations were no more Douglas's evil zombies. Freed from his spell they became entitled to the return of the moneys— for the benefit not of Douglas but of innocent investors—that Douglas had made the corporations divert to unauthorized purposes." *Id.* at 754. The trustee here reasons that he stands in the same position as the *Scholes* receiver: Lake States may have been a wrongdoer at one time, but now that the trustee is in control, he should be able to pursue claims against the other wrongdoers for the benefit of the entire class of creditors.

Although the trustee's *Scholes* argument is convincing on the inapplicability of the *in pari delicto* doctrine here, he overlooks a crucial difference between *Scholes* and the present case. For purposes of determining whether a suit must be brought by the trustee on behalf of the creditor class as a whole or may be brought by an individual creditor, the claims available to the trustee are not the same as those the Apostolou Plaintiffs are trying to bring under the Commodities Exchange Act, the Securities Act of 1933, the Securities Exchange Act of 1934, and RICO, and for common-law fraud. The Second Circuit's decision in *Bankers Trust Co., supra,* illustrates this point well. In that case, the debtor corporation, Braten Apparel Corporation ("BAC"), was engaged in the apparel business. Its largest creditor was Bankers Trust Company ("Bankers"). BAC fell on hard times in August 1974, and a Chapter 11 filing followed shortly thereafter. Around the same time, two of BAC's owners agreed fraudulently to conceal from BAC's creditors one of the company's major assets, a subsidiary corporation. Relying on their misrepresentations, Bankers agreed to a reorganization plan under which it was to receive only 17.5% of its allowed claim. After further shenanigans, which included bribing a state court judge in proceedings affecting BAC's and Bankers' interests, Bankers moved to revoke BAC's confirmation plan. It took almost six years for the bankruptcy court to

rule on that motion, during which time the owners looted the corporation.

After the court at last revoked the confirmation plan, Bankers brought an independent action against BAC's owners under RICO, alleging that their common-law fraud, bankruptcy fraud, bribery, and fraudulent conveyances amounted to a pattern of racketeering activity in violation of 18 U.S.C. § 1962(a)-(d). As in this case, the corporate debtor's trustee claimed that Bankers did not have standing to sue the individual defendants. The trustee argued that if Bankers was permitted to pursue its RICO claim, there might be nothing left in the defendants' coffers from which the bankrupt's estate could recover. The Second Circuit acknowledged the problem, but it held that "if Bankers was injured by defendants' acts, as its complaint adequately alleges in this case,... it has standing to bring a RICO claim, regardless of the fact that a bankrupt BAC might also have suffered an identical injury for which it has a similar right of recovery." 859 F.2d at 1101 (internal citation omitted). Bankers, the court emphasized, was not seeking recovery for injuries suffered by BAC, but instead wanted a remedy for injuries it suffered directly as a result of the defendants' bribery, perjury, fraud, and bankruptcy fraud.

Having recognized this fact, however, the court also acknowledged that there was an overlap between RICO and bankruptcy law on the facts before it. The overlap occurred both because Bankers was injured by the identical transactions that harmed BAC, and because, to the extent that BAC's trustee could recover for *BAC's* injury, the portion of Bankers' injury stemming from its status as creditor of BAC would be correspondingly reduced. *Id.* at 1101, 1106. Because the trustee's efforts had the potential to reduce Bankers' injury, the court held that it was impossible to determine the measure of damages Bankers suffered on its own before the conclusion of the bankruptcy proceeding. It therefore ordered those claims dismissed without prejudice to refiling after the bankruptcy court resolved the trustee's claims. *Id.* at 1106–07.

The Apostolou Plaintiffs stand in a position analogous to that of Bankers. Their claims arise from the misuse of their funds by Lake States and its agents to prop up or profit from the bucket shop scheme. To the extent they are suing the agents—both the individuals and Gelderman—for debts that arose out of these transactions, they stand in exactly the same position as the rest of the aggrieved investors, pursuing identical resources for redress of identical, if individual, harms. As creditors with claims so closely related to the Lake States estate, the Apostolou Plaintiffs must wait their turn behind the trustee, who has the responsibility to recover assets for the estate on behalf of the creditors as a whole, *Koch Refining*, 831 F.2d at 1343–44, and like the trustee in *Bankers Trust* and the hypothetical trustee in *Troelstrup v. Index Futures Group, Inc.*, 130 F.3d 1274, 1277 (7th Cir.1997), the trustee in this case has claims against the Apostolou Defendants and is pursuing them to maximize the debtors' estates for the benefit of their creditors, including the Apostolou Plaintiffs.

Nonetheless, as in *Bankers Trust,* where Bankers' RICO claims against BAC included the prospect of treble damages, their injuries may not be fully measured by the debts owed to Lake States. Some, but perhaps not all, of the individual investors may be able to show acts of fraud, cognizable under one or more of the theories raised in the complaint, that imposed a separate and distinct injury on that person. While we make no suggestion about the merits of their claims, it may be possible, for example, for some of the Apostolou Plaintiffs to show separate and distinct injuries on their RICO claim, or on their claim for common law conspiracy to defraud—which could give them the opportunity to pursue punitive damages, see *Kelsay v. Motorola, Inc.*, 74 Ill.2d 172, 23 Ill.Dec. 559, 384 N.E.2d 353, 359 (1978).

### III

■ When it put BAC's lawsuit on hold, the *Bankers Trust* court relied on the comment in *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 339, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971), that "it is hornbook law ... that even if injury and a cause of action have accrued as of a certain date, future damages that might arise from the

conduct sued on are unrecoverable if the fact of their accrual is speculative or their amount and nature unprovable." This language may or may not be a solid basis for the holding in *Bankers Trust,* since the rule to which the *Zenith Radio* Court referred is directed toward future harms, rather than future adjudications and damages awards. But we need not take a position on that question, since § 105 provides a sound basis for both the *Bankers Trust* decision and the decision of the bankruptcy court in this case.

■ In limited circumstances, the trustee may temporarily block adjudication of claims that are not property of the estate by petitioning the bankruptcy court to enjoin the other litigation, if it is sufficiently "related to" her own work on behalf of the estate. 28 U.S.C. § 1334(b). The jurisdiction of the bankruptcy court to stay actions in other courts extends beyond claims by and against the debtor, to include "suits to which the debtor need not be a party but which may affect the amount of property in the bankrupt estate," *Zerand–Bernal Group, Inc. v. Cox,* 23 F.3d 159, 161–62 (7th Cir.1994), or "the allocation of property among creditors." *In re Memorial Estates, Inc.,* 950 F.2d 1364, 1368 (7th Cir.1992); see also Lawrence P. King, Collier on Bankruptcy ¶ 105[2]; *In re Heath,* 115 F.3d 521, 524 (7th Cir.1997) ("related to" means "likely to affect"). To protect this jurisdiction, "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title," 11 U.S.C. § 105(a), including a stay. *Zerand–Bernal,* 23 F.3d at 162.

■ As described earlier, the bankruptcy court agreed with the trustee on the merits of the § 105 preliminary injunction, and found all four of the traditional elements required to support a preliminary injunction. (There were no relevant factual disputes. *Apostolou,* 188 B.R. at 963 & n. 8.) This was an unnecessary exercise, however, since "a bankruptcy court can enjoin proceedings in other courts when it is satisfied that such proceedings would defeat or impair its jurisdiction over the case before it. In other words, the court does not need to demonstrate an inadequate remedy at law or irreparable harm." *In re L & S Industries, Inc.,* 989 F.2d 929, 932 (7th Cir.1993). "Of course, the moving party must still establish a likelihood of success on the merits." *Id.* The *L & S* court did not address the fourth factor applicable to preliminary injunctions—whether the injunction will harm the public interest—but given that both the terms and the underlying purpose of the federal bankruptcy code are geared, at least in part, to protect the public interest, we have no trouble concluding that the bankruptcy court was required to consider it when weighing the merits of the trustee's complaint. In any event, there is no evidence in the record contradicting either the bankruptcy court's finding of likely success on the merits or its finding of no harm to the public interest or, for that matter, its conclusions on the other traditional requirements for an injunction.

While the Apostolou Plaintiffs' claims are not "property of" the Lake States estate, it is difficult to imagine how those claims could be more closely "related to" it. They are claims to the same limited pool of money, in the possession of the same defendants, as a result of the same acts, performed by the same individuals, as part of the same conspiracy. We can think of no hypothetical change to this case which would bring it closer to a "property of" case without converting it into one. Even if the "related to" jurisdiction is not as broad in Chapter 7 cases as it is in Chapter 11 cases, see *Celotex Corp. v. Edwards,* 514 U.S. 300, 310, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995), it reaches at least this far, for to conclude that the "related to" jurisdiction under Chapter 7 does not extend to the circumstances of this case would be to amend the Bankruptcy Code to eliminate § 105 from Chapter 7 proceedings. As a result, whether we follow all or merely most of the Second Circuit's reasoning in *Bankers Trust,* the dispute over the trustee's standing to pursue the Apostolou Plaintiffs' claims is irrelevant. What is important is the bankruptcy court's "related to" jurisdiction, which is present, and its exercise of its injunctive power, which was not an abuse of discretion.

Unlike the more common case in which a creditor of a bankrupt files a claim against an insurer or guarantor of the bankrupt and is allowed to proceed, see *In re Hendrix,* 986 F.2d 195, 197 (7th Cir.1993), this is a case in which the question is not whether successful

 

prosecution of a claim by a creditor will "create a 'personal liability of the debtor,'" *id.* (quoting § 524(a)(2)), or whether a debtor's discharge will affect the liability of the third-party target of a creditor's lawsuit, *In re Hendrix*, 986 F.2d at 197 (citing § 524(e)). Rather, it is a question of whether the overlap between the claims of the debtor (Lake States) and the claims of the creditors (the Apostolou Plaintiffs) against third parties (the Apostolou Defendants) are so closely related that allowing the creditors to convert the bankruptcy proceeding into a race to the courthouse would derail the bankruptcy proceedings. We see no conflict between affirming the power and the responsibility of the bankruptcy court to preliminarily enjoin "suits to which the debtor need not be a party but which may affect the amount of property in the bankrupt estate," *Zerand–Bernal*, 23 F.3d at 161–62, and recognizing the freedom (at least in most cases) of creditors to bring suits that are "only nominally against the debtor because the only relief sought is against his insurer," guarantor, or other similarly situated party. *In re Hendrix*, 986 F.2d at 197.

Rather than dismiss the Apostolou Plaintiffs' action, even without prejudice, as the Second Circuit did in *Bankers Trust* (an approach we approved in *Barnett v. Stern*, 909 F.2d 973, 977 n. 4 (7th Cir.1990)), we think it sufficient in this case to follow the lead of the bankruptcy court and stay the proceedings pending the outcome of the bankruptcy proceeding. At that point, the degree to which the Apostolou Plaintiffs have been compensated for their injuries through their share of the assets in the debtors' estates will be settled, and it will be possible for the district court to proceed with this action against the nondebtor defendants for whatever individualized damages may be proper. Because all of the Apostolou Plaintiffs' actions must be stayed while the Lake States bankruptcy proceeds, there is no need to consider separately the relationship between these actions and the Collins bankruptcy matter.

The district court's holding that the Apostolou Plaintiffs' claims are not property of the Lakes States estate is affirmed, but the decision of the district court is REVERSED and the preliminary injunction entered by the bankruptcy court is reinstated. Each party will bear its own costs on appeal.