TELESPHERE LIQUIDATING TRUST, as successor in interest to Telesphere Communications, Inc., Telesphere Network, Inc. and Telesphere Limited, Inc., Plaintiff–Appellant,

v.

Francesco GALESI, Defendant–Appellee.

No. 99 C 4827.

Adversary No. 94 A 1051.

United States District Court, N.D. Illinois, Eastern Division.

March 16, 2000.

Larry Wolfson, Jay Geller, Timothy Chorvat, Jenner & Block, Chicago, IL, for appellant.

Stuart Rozen, John Touhy, Kenneth Noble, Mayer Brown & Platt, Chicago, IL, for appellee.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Telesphere Liquidating Trust ("Trust"), as successor in interest to Telesphere Communications, Inc. ("Communications"), Telesphere Network, Inc. ("Network") and Telesphere Limited, Inc. f/k/a National Telephone Service, Inc. ("Service") (all of those predecessors in interest are collectively termed "Telesphere" or "Debtors"), has appealed from three orders entered by Bankruptcy Judge Eugene Wedoff in Telesphere's Chapter 11 proceedings.[1] Those orders granted either dismissal or summary judgment in favor of defendant Francesco Galesi ("Galesi") on all 25 counts of Trust's amended complaint.

This Court has reviewed Judge Wedoff's rulings, the record and the extensive briefs submitted by the parties.[2] It affirms

---

1. As always, Judge Wedoff's thoughtful work has greatly facilitated the review and decisional process for this Court. Though to be sure there is one respect in which we have parted company, both views on that issue can certainly muster respectable support.

2. This opinion cites to Trust's opening and reply briefs as "T.Br. __" and "T.R.Br. __" and to Galesi's responsive brief as "G.Br. __." It cites to the transcripts of unwritten Bankruptcy Court orders by the dates of the oral rulings, as in "June 2, 1997 Tr. __."

those rulings as to the counts embodying two of Trust's theories of liability, reverses the dismissal of the counts based on a third theory and remands those reversed counts for further proceedings consistent with this memorandum opinion and order.

### Jurisdiction and Standards of Review

■ United States District Courts have jurisdiction over appeals from final judgments and final orders in bankruptcy cases pursuant to 28 U.S.C. § 158(a). On such an appeal this Court may affirm, modify, or reverse the Bankruptcy Court's judgment and, to the extent required, may remand with instructions for further proceedings (Fed.R.Bankr.P.8013). There is no presumption of correctness as to the Bankruptcy Court's conclusions of law, which are reviewed de novo (*In re Salzer,* 52 F.3d 708, 711 (7th Cir.1995); *In re C & S Grain Co.,* 47 F.3d 233, 236 (7th Cir. 1995)).

■ Because the granting of a motion to dismiss for failure to state a claim is also reviewed de novo, an independent review of the record is required to determine whether, assuming the truth of all well-pleaded factual allegations and drawing all reasonable inferences in favor of Trust, Judge Wedoff properly dismissed Counts III through VI and XI through XXV of the Complaint. Just as when this Court rules on a Fed.R.Civ.P. ("Rule") 12(b)(6) motion, dismissal is in order only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations" (*Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984), quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

In the same way, this Court applies the conventional predicates for granting (or denying) summary judgment. To that end familiar Rule 56 principles impose on Galesi the burden of establishing the lack of a genuine issue of material fact as to Counts I and II and Counts VII through X (*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

For that purpose this Court reads the record in the light most favorable to Trust, although it "is not required to draw unreasonable inferences from the evidence" (*St. Louis N. Joint Venture v. P & L Enters., Inc.,* 116 F.3d 262, 265 n. 2 (7th Cir.1997)). And the summary judgment rulings against nonmovant Trust were appropriate only if the record reveals that no reasonable factfinder could conclude that Galesi had acted in a manner forbidden by the Bankruptcy Code ("Code") (see *Fuka v. Thomson Consumer Elecs.,* 82 F.3d 1397, 1402 (7th Cir.1996) and cases cited there).

Accordingly, as with every summary judgment motion, this Court accepts Trust's version of any disputed facts. What follows in the *Background* section (and to some extent later) is culled from the parties' submissions, with any differences between them resolved in Trust's favor.

### Background

Network, a wholly-owned subsidiary of Communications, began providing long distance telephone services in 1979. In January 1989 Galesi acquired effective control of both corporations by causing one of his wholly-owned companies, FG Ventures, Inc., to purchase $13.85 million in face amount of Network debentures. Those debentures were convertible into 22,725,243 shares of Communications common stock that, if issued and added to the 510,000 Communications shares that Galesi already owned, would make Galesi a 53% shareholder capable of naming two of Communications' five directors.

When Galesi acquired his interest, both Communications and Network were experiencing financial difficulty. Communications' board was restructured and turnaround management was installed. Nevertheless, during 1989 the corporations continued to lose money, suffered liquidity and cash flow problems and fell more than $1 million behind in the required payments to their primary supplier of long distance transmission capacity,

Williams Telecommunications Group, Inc. ("WilTel"). As of December 31, 1989 Communications reported liabilities exceeding assets by more than $4 million and an accumulated deficit of $69.6 million.

In January and February 1990 Service's management made an initial presentation to Communications suggesting that the latter acquire Service—a transaction intended to create a combined telecommunications entity with an improved marketplace position. On March 28, 1990 Communications, Network and Service's majority shareholder Ronald Haan ("Haan") executed a letter of intent contemplating a two-step leveraged buy-out ("LBO") in which Communications would first lend money to Service and later buy Service's stock. Then on May 31, 1990 Communications entered into a Stock Purchase Agreement pursuant to which it became obligated, among other things, to purchase all of Service's stock for a combination of cash, notes, Communications stock and warrants. And on the same day the parties consummated Step One of the LBO: WilTel loaned $26 million (the "WilTel Loan") to Communications, which in turn loaned it to Service, which in turn paid it to Haan. To reflect its obligation, Service gave Communications a $26 million note (the "Service Note"), which was secured by stock owned by Haan. In turn, Communications immediately assigned its rights under the Service Note to WilTel as security. In an effort to ensure repayment of the WilTel Loan, WilTel attached four strings to its securitization bow, only two of which are relevant for purposes of this appeal: (1) Galesi's personal guaranty and (2) the Service Note.

By September 1990 Communications was rapidly losing business and revenues. As a result of that deteriorating financial condition, Communications and Network had difficulty securing financing to complete Step Two of the LBO. Although that step had originally been scheduled for July 31, 1990, it was postponed until October 15, 1990. On that date Service and Network borrowed (and Communications guaranteed repayment of) approximately $94 million from Citibank, Bell Atlantic and a lender group (collectively the "Banks") and granted the Banks security interests in virtually all of both borrowers' assets. Communications and Network combined the Step Two loan proceeds with over $1 million of their own cash to make these payments: (1) $21 million to Haan and other Service shareholders for their Service stock, (2) $26.8 million to WilTel to pay off the Step One WilTel Loan, (3) $38.8 million to clear pre-existing liens and (4) $9 million to professionals and Banks as transaction costs.[3]

On October 22, 1990—one week after the LBO closing—Galesi became a member of the Communications Board of Directors. Communications then extinguished the Service Note. Thereafter Telesphere's financial condition spiraled downward, and many of its debt obligations went into default. Telesphere restructured its debts to the Banks, WilTel, Haan and other major creditors, but on August 19, 1991 an involuntary Chapter 7 petition was filed against Communications. On September 11, 1991 Communications converted its involuntary Chapter 7 case into a voluntary Chapter 11 case, and at the same time Network and Service filed voluntary petitions for relief under Chapter 11. Then the Bankruptcy Court entered orders for relief in the Debtors' cases.

On November 1, 1991 Telesphere's operating assets were sold to Haan for approximately $17 million. Several years later the Bankruptcy Court confirmed Debtors' liquidating plan of reorganization ("Plan"), which created Trust as the vehicle to liquidate and distribute Telesphere's remaining assets. Under the Plan the aggregation of Communications, Network and Service as-

---

**3.** Thus none of the proceeds went directly to Galesi, though the repayment of the WilTel Loan of course extinguished his guaranty of that obligation.

sets were to be distributed pro rata to all unsecured creditors of all three Debtors.

On August 8, 1995 Trust commenced this adversary proceeding against Galesi by filing a four-count complaint asserting claims of preference (Count I), fraudulent transfer (Counts II and III) and breach of fiduciary duty (Count IV). Some three months later Trust filed an amended 25–count complaint alleging more detailed claims of preference (Counts I and II), fraudulent transfer (Counts III through XX) and breach of fiduciary duty (Counts XXI through XXV). In general Counts I through X deal with various claims arising out of the LBO's Step One, while Counts XI through XX assert claims arising out of the LBO's Step Two. Counts XXI through XXV allege that the LBO as a whole constituted an actionable breach of fiduciary duty.

### Counts I and II: Code § 547 Preference Claims

Counts I and II were resolved in Galesi's favor via summary judgment on May 27, 1999. Those counts alleged that Galesi had caused Communications (or alternatively Network) to repay WilTel in full on the WilTel Loan—which had been guaranteed by Galesi, so that the repayment was assertedly for his benefit—in preference to other general unsecured creditors.

In that respect Code § 547(b) provides: Except as provided in subsection (c) of this section, a trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) to or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

Neither party disputes the obvious satisfaction of the first four of those provisions, so that the only contested issue is whether Code § 547(b)(5) was met.

■ On that score Trust admits that (T.Br. 15, emphasis added):

payments to creditors whose claims are fully secured *by the debtor's property* do not satisfy Section 547(b)(5), because it makes no difference to the debtor's other creditors whether the creditor receives a pre-petition payment or simply recovers its collateral in a Chapter 7 liquidation.

If then the WilTel Loan was fully secured by Debtors' property, Code § 547(b)(5) was not satisfied and there would be no preferential transfer to avoid. As the ensuing discussion reflects, this Court agrees with the Bankruptcy Court that the WilTel Loan was indeed secured by "property of the debtor" and not by third-party collateral.

■ When Communications granted WilTel a security interest in the $26 million Service Note payable to Communications, it provided WilTel with a security interest in Communications' (and thus ultimately Debtors') property. Courts have often confirmed the obvious proposition that a promissory note payable to the debtor is property of the debtor's bankruptcy estate (see, e.g., *Leeling v. Smith* (*In re Leeling*), 129 B.R. 637, 640–41 (Bankr.D.Colo.1991); *In re Capital Mort-*

gage & Loan, Inc., 35 B.R. 967, 970 (Bankr.E.D.Cal.1983); *BeVier v. Warder (In re BeVier)*, 12 B.R. 75, 76 (Bankr. D.S.D.1981)). And contrary to Trust's argument, Communications' assignment of the note to WilTel as security did not affect its status as Debtors' property. For example, *Kaler v. Craig (In re Craig)*, 144 F.3d 593, 596 (8th Cir.1998) held that a promissory note remained property of the debtor's estate even where the note had been turned over to the issuer to secure the issuer's guaranty of a separate loan.

■ Although Trust does not dispute that promissory notes payable to a debtor may be part of its bankruptcy estate, Trust argues (without citation) that "[t]o be considered a debtor's property for preference purposes, a debtor must be able to realize a benefit from an asset" (T.Br. 17). Trust's later argument makes clear that by "benefit" it means the ability to sell or transfer the Service Note. But this Circuit's case law teaches that a debtor's ability to transfer property is irrelevant to the determination of whether that property is part of the debtor's estate (see, e.g., *In re Geise*, 992 F.2d 651, 655 (7th Cir.1993), holding that an inability to transfer a personal injury cause of action did not prevent it from becoming part of the bankruptcy estate; *In re Hunter*, 970 F.2d 299, 302, 305 (7th Cir.1992), holding that tenancy by the entirety property is part of the bankruptcy estate).

Instead of adequately explaining why Debtors could not assertedly realize a benefit from the Service Note, Trust discusses several cases that hold nominal interests in property to be insufficient to make those assets property of the debtor's estate. Thus Trust seeks support in *Glinka v. Bank of Vermont (In re Kelton Motors,*

*Inc.)*, 97 F.3d 22 (2d Cir.1996), a case where third parties took out loans and directed that the proceeds be used to pay off the debtor's obligations. *Glinka, id.* at 26–27 found that the treasurer checks (proceeds of the loan) were not property of the estate because they had never been in the debtor's possession and had never been intended to be subject to the debtor's control.

Trust Br. 2 attempts to liken its situation to that of the debtor in *Glinka:*

Exactly as in *Glinka*, the [Service] Note was technically payable to [Communications], but was immediately assigned to WilTel, along with the right to receive all payments on the note.

That, however, misses an important distinction between the two situations. Unlike the status of the checks in *Glinka*, Communications did gain both possession of and control over (and it clearly intended to have such control over) the Service Note when it was made payable to Communications.[4] And Communications, not Service, then pledged that note as collateral for the WilTel loan.

In that regard Trust protests that the Service Note was "technically payable" to Communications. There was nothing "technical" about it—a note either is or is not payable to a party. Here the Service Note was indeed payable to Communications and was fully intended to be within its control and, in turn, part of the estate.[5] Although the time period for the Telesphere transactions might be more compressed than in the earlier-cited promissory note cases, Trust offers nothing that convinces this Court that the Service Note should be treated differently from those other promissory notes.

4. *Glinka* is also distinguishable from this case for another reason. There the transfer would have been deemed a preferential transfer if the loan proceeds *were* part of the debtor's estate. Here the transfer would be deemed a preferential transfer only if the Service Note *was not* part of Debtors' estate.

5. Judge Wedoff's oral ruling (Dec. 1, 1997 Tr. 9–10) ably explains the flaw in Trust's third-party collateral theory, leaving open only a potential factual issue that was later closed by the parties' Stipulation of Fact in connection with the summary judgment motion on Counts I and II.

This Court therefore holds that the Service Note was neither third-party collateral nor an accommodation note, but was rather property of Debtors that properly secured the WilTel Loan. That being so, repayment of the WilTel Loan was not a preferential transfer. And this holding makes it unnecessary to address the other issue raised by Trust: whether Debtors were entitled to an earmarking defense.[6]

*Fraudulent Transfer Claims*[7]

*Counts VII through X: Intercompany Avoidance Actions*

■ Counts VII through X are claims brought alternatively by either Service or Network, both under Code § 544(b) and state law and under Code § 548(a). They posit that the WilTel Transfer was fraudulent and hence avoidable because Galesi caused either Service or Network to pay Communications' debt without receiving any value in return for that payment. Here too the Bankruptcy Court granted summary judgment in favor of Galesi on those counts, this time on the ground that the Plan—which substantively consolidated the bankruptcy estates of Service, Network and Communications—eliminated all intercompany liability (Aug. 28, 1997 Tr. 10–12).

■ Substantive consolidation eliminates fraudulent transfer claims arising from one debtor's payment of a debt owed by another consolidated debtor (*Chemical Bank N.Y. Trust Co. v. Kheel,* 369 F.2d 845, 847 (2d Cir.1966) ("By the order of consolidation, in effect the intercompany claims of the debtor companies are eliminated...."); *Gill v. Sierra Pac. Constr., Inc. (In re Parkway Calabasas, Ltd.),* 89 B.R. 832, 839 (Bankr.C.D.Cal.1988), finding that substantive consolidation eliminated fraudulent transfer claim because the merger of the two estates left "no party unjustly enriched and no creditors looking to an impoverished asset pool for payment"). Trust does not dispute that substantive consolidation has such an effect on inter-entity claims. Instead it argues that the Plan was not a complete consolidation, so that it preserved such inter-entity claims.

In support of that position, Trust cites various Plan and Disclosure Statement provisions indicating that Trust planned to pursue recoveries in connection with each bankruptcy estate's claims and that Galesi was a possible defendant to those claims (T.Br. 44–46). But none of those provisions spoke to, let alone explicitly preserved, inter-entity claims.

It is painfully obvious that Counts VII through X were not the only claims that Trust contemplated pursuing against Galesi (indeed, this lawsuit is the best evidence of that). So no generalized retention of a right to sue Galesi negates the natural consequence of the substantive consolidation: elimination of the inter-entity based claims. Nor can Trust successfully call upon the definition of "Bankruptcy Actions" as support for its position, for that definition explicitly recognized that the Plan would eliminate some potential claims (Plan at 2 (emphasis added)):

"Bankruptcy Actions" means any and all claims and causes of action of Telesphere, including, without limitation, any and all claims and causes of action of Telesphere arising under sections 510, 544, 545, 547, 548, 549 or 550 of the

---

6. As if to draw upon Emerson's aphorism about "foolish consistency," Trust first attempts to analogize the use of the Service Note to secure the WilTel Loan to an earmarked transfer (T.R.Br. 2), yet it then argues that Galesi was not entitled to an earmarking defense (*id.* 3). Pace Emerson, such inconsistency does not inspire confidence in Trust's contentions. But in all events, the earmarking issue is not before this Court.

7. As to such claims in Counts III through VI, Trust has requested that this Court reverse the Bankruptcy Court's decision to dismiss those counts in the event that Galesi were to ask this Court to reverse the Bankruptcy Court's finding that the *Deprizio* waiver was invalid (T.Br. 47). Because Galesi has not thus asked this Court to address the *Deprizio* waiver, there is no need to deal with Counts III through VI.

Bankruptcy Cope, *other than those dismissed, released, settled or compromised under* the Settlement or *the Plan* or by a Final Order of the Bankruptcy Court on or before the Effective Date of the Plan.

Thus Trust's stated intention to pursue Bankruptcy Actions confirms only its contemplated pursuit of any remaining post-consolidation claims.

In sum, nothing in Trust's argument or in the Plan persuades this Court that Judge Wedoff was incorrect in stating (Aug. 28, 1997 Tr. 12):

In this case there is complete substantive consolidation in the sense that I've just discussed. All claims of the entities are merged, all assets of all the entities are merged. A recovery by any entity benefits the creditors of the three entities. Generally, a claim against any entity is paid by the assets of the three entities generally. The reservation of the right of the trust to pursue causes of action doesn't change that reality. The trust is certainly free to pursue any cause of action. But if the cause of action is substantively nullified by the substantive consolidation, a motion of this sort that's brought before me ought to be granted.

This Court therefore also affirms the Bankruptcy Court's grant of summary judgment in Galesi's favor on Counts VII through X.

*Counts XI through XX*

■ Counts XI through XX, also brought under Code § 544 and state law and Code § 548, claim that the LBO Security Interests and the Service Acquisition Payments constituted fraudulent transfers—transfers that should be avoided and recovered (from Galesi) for the benefit of Telesphere's creditors. Those claims were also rejected by Judge Wedoff.

As to those claims Galesi asserts that, regardless of whether the transfers at issue were fraudulent, Code § 550(a) bars them as a matter of law. Here is Code § 550(a):

Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

Galesi's position is that he does not fall within any of those target categories, so that no recovery may be sought from him. Trust counters that it may recover the transfers from Galesi because he was the "entity for whose benefit such transfer was made."

This Court agrees with Judge Wedoff's determination that the claimed "benefit" to Galesi, as described by Trust, is too uncertain to place him within the reach of Code § 550(a). To be sure, there is an unequal distribution of risk involved when insolvent enterprises engage in high-risk transactions (T.Br. 41). But the potential upside benefit to Galesi from the challenged transactions (a benefit that he did not receive, as things turned out) is simply not enough to support a determination that the transactions themselves were entered into for his benefit. Judge Wedoff expressed this Court's views well when he addressed those counts (June 2, 1997 Tr. 7):

The benefit that is the predicate for each of these counts, the benefit of potentially being able to recognize value in an equity contribution is, as the motion to dismiss and supporting memoranda point out, one that no Court has ever recognized. And it has the potential for much broader liability because of the number of parties who might be benefitted in such a way with no connection to those parties actually having effectuated the transaction for their own benefit.

This enormous expansion of potential liability under Section 550 of the Bankruptcy Code is one that I think counsels very strongly against it being accepted as a matter of law in a case of first impression. The traditional limitation of the benefit provision of Section 550 being the elimination of a liability or the creation of a particularized quantifiable benefit is one that I think is one that this Court needs to continue to follow.

Certainly Galesi's potential for receiving some amorphous possible "benefit" was nothing like that of the debtor's principals in *Gibbons v. Stemcor U.S.A., Inc. (In re B.S. Livingston & Co.)*, 186 B.R. 841, 863–65 (D.N.J.1995) (a case cited by Trust)—in sharp contrast, those principals were assured of receiving lucrative positions based on their role in the fraudulent transfer. Nor is this Court prepared to extrapolate from the dictum that Trust cites from *Steinberg v. Kendig (In re Ben Franklin Retail Stores, Inc.)*, 225 B.R. 646, 655–56 (Bankr.N.D.Ill.1998) as a basis for significantly expanding the reach of Section 550(a) to encompass Galesi's role in the transactions at issue. *Steinberg* addressed the possible expansion of breach of fiduciary duty claims and, in a footnote, the possible expansion of Section 548(a)'s fraudulent transfer definition. It did not suggest that Section 550(a)'s definition of an "entity for whose benefit such transfer was made" should be broadened to allow recovery for such unquantifiable and uncertain benefits as those at issue here. This Court affirms the Bankruptcy Court's dismissal of Counts XI through XX.

### *Counts XXI through XXV: Breach of Fiduciary Duty*

■ On Trust's final set of claims, the Bankruptcy Court granted Galesi's Rule 12(b)(6) motion to dismiss Counts XXI through XXV after finding that those claims were barred by the Code § 108(a) statute of limitations.[8] Trust objects that because those claims were brought under Code § 544(a),[9] they should instead be subject to the statute of limitations in Code § 546(a).[10]

---

8. Code § 108(a) provides:
   If applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before the later of—
     (1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or
     (2) two years after the order for relief.

9. Code § 544(a) reads:
   The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—
     (1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists;

  (2) a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists; or
  (3) a bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists.

10. Code § 546(a), as it existed before the here-inapplicable 1994 amendments, provided:
    An action or proceeding under section 544, 545, 547, 548, or 553 of this title may not be commenced after the earlier of—
      (1) two years after the appointment of a trustee under section 702, 1104, 1163, 1302, 1202 of this title; or
      (2) the time the case is closed or dismissed.

For his part, Galesi does not dispute that Trust could bring those breach of fiduciary duty claims under Code § 544(a) (see G.Br. 21). As *Koch Refining v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1348 (7th Cir.1987) (citation omitted) has said:

It is axiomatic that the trustee has the right to bring any action in which the debtor has an interest, including actions against the debtor's officers and directors for breach of duty or misconduct. In that capacity, the trustee acts to benefit the debtor's estate, which ultimately will benefit the debtor's creditors upon distribution. He also has creditor status under section 544 to bring suits for the benefit of the estate and ultimately of the creditors.

More recently *Fisher v. Apostolou*, 155 F.3d 876, 879–80 (7th Cir.1998) has reconfirmed the *Koch* reading of the "strong-arm" provisions of Section 544, distinguishing actions that "represent the interests of the creditors as a class"—an apt description of the breach of fiduciary duty actions against Galesi—from "personal claims of creditors," which "the trustee has no standing to bring."[11] Accord, in the same context that is at issue here, *Henderson v. Buchanan (In re Western World Funding, Inc.)*, 52 B.R. 743, 775 (Bankr.D.Nev.1985)

("the trustee's [breach of fiduciary duty] action is an appropriate application of his status as a 'supposed or hypothetical' creditor under § 544(a)").[12] Galesi rather contends that despite Code § 546(a)'s explicit inclusion of Code § 544 claims within its statute of limitations, the claims at issue come within Code § 108(a) because they are nonbankruptcy law claims.

*Wieboldt Stores, Inc. v. Schottenstein*, 131 B.R. 655, 668 (N.D.Ill.1991), which addressed precisely this question—whether Code § 108(a) or Code § 546(a) should apply to breach of fiduciary duty claims brought under Code § 544(a)—held:

Because the court finds that the Trustee brings Counts XV and XVI pursuant to Section 544(a), Counts XV and XVI are governed by the statute of limitations provided by Section 546(a).

Although a district court opinion is not of course binding precedent, this Court sees no reason to differ from *Wieboldt*, and it also sees no reason to assume as the Bankruptcy Court did (June 2, 1997 Tr. 12) that *Wieboldt* did not consider "the interplay between Section 108 and Section 546 in arriving at its decision."[13]

As long as a trustee exercises the undeniable right (viz. *Koch Refining* ) to bring a claim under Code § 544, the express

11. Regrettably, Galesi's counsel have mischaracterized the *Fisher* decision by stating (G.Br.39):

Moreover, the *Fisher* [court] expressly stated that it was not addressing the standing issue because "the dispute over the trustee's standing to pursue [direct claims of creditors] is **irrelevant.**" *Id.* at 882 (emphasis added).

That quoted statement referred to the fact that the claims at issue there belonged to fewer than all of the creditors and were therefore not property of the estate (as Trust's breach of fiduciary duty claims in this case unquestionably were). That was found irrelevant in *Fisher*, because the claims there fell within the Bankruptcy Court's "related to" jurisdiction in any event. Thus counsel's insertion of the bracketed phrase in their *Fisher* quotation is misleading—what is said in the text here accurately portrays the case's reconfirmation of *Koch*.

12. Although *Henderson* was reversed by the District Court in terms of the substantive liability of the individual defendants for breach of fiduciary duty (131 B.R. 859 (D.Nev.1990)), the Court of Appeals reversed that in turn because it agreed with the Bankruptcy Court (985 F.2d 1021 (9th Cir.1993)). Most importantly, the ultimate Court of Appeals ruling obviously confirmed the propriety of actions by the trustee in bankruptcy.

13. In *Wieboldt* this Court's colleague, Honorable James Holderman, expressly found the claim at issue to be a "creditors' bill"—the characterization that is sought to be relied on by Galesi here in urging the opposite conclusion—en route to reaching Judge Holderman's decision. That can scarcely be labeled an *unconsidered* judgment, as Bankruptcy Judge Wedoff assumed.

language of Code § 546(a) brings its limitations period into play. Nothing in Code § 546(a) excludes (or implies the exclusion of) Code § 544 claims that could have been brought under another Code provision as well.

It may well be that the pre-amendment version of Code § 546(a) tended to undercut the operation of Code § 108(a) in situations such as this—and that may well be the (or at least one) reason why Code § 546(a) was later amended to enact a statute of limitations similar to that in Code § 108(a). But that is no reason for this Court to engage in judicial legislation by effectively backdating that amendment.[14] This is not an instance, as the Bankruptcy Court suggested (June 2, 1997 Tr. 11), of causing Code § 108(a) to "be written out of the Bankruptcy Code." Instead this Court agrees with *Mancuso v. Continental Bank N.A. Chicago (In re Topcor, Inc.)*, 132 B.R. 119, 125 (Bankr. N.D.Tex.1991):

> The defendant contends that holding § 546(a) as the applicable limitations provision for § 544(b) actions instead of as an additional limitation would render § 108(a) of the Code meaningless. This Court, however, concludes that its ruling that § 546(a) governs actions brought under § 544(b) does not invalidate the meaning of § 108.

In short, this Court agrees with Trust that Counts XXI through XXV should have been subjected to the Code § 546(a) statute of limitations. That requires the reversal of the Bankruptcy Court's dismissal of those counts, which are remanded for further proceedings.[15]

14. Indeed, although a look at legislative history has provided no enlightenment on the subject (and this Court is well aware of the case law teaching that a later Congress' statements about earlier legislation is an unreliable guide to the earlier Congress' intention), what *is* clear is that the later enactment changed the prior law. At a minimum that creates a strong inference that a trustee that could

*Conclusion*

All of the Bankruptcy Court's rulings in Galesi's favor are affirmed except for the dismissal of Counts XXI–XXV. Those claims are remanded to the Bankruptcy Court for resolution on the merits.

bring a pre-amendment claim within the scope of Section 544 could call upon the longer limitations period in the pre-amendment version of Section 546(a).

15. Trust's other arguments against dismissal need no discussion.